IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEPHON BENNETT, | Civil No. 3:17-cv-2414 |
| Plaintiff | (Judge Mariani) |
| v. | |
| LIEUTENANT KEEL, *et al.*, | |
| Defendants | |

## MEMORANDUM

### I. Background

Plaintiff Stephon Bennett ("Bennett"), an inmate who was housed at all relevant times at the State Correctional Institution at Smithfield, in Huntingdon, Pennsylvania ("SCI-Smithfield"), initiated this action pursuant to 42 U.S.C. § 1983. (Doc. 1). Named as Defendants are Lieutenant Keel, Lieutenant Rhone, Sergeant Wiser, Sergeant Sheetz, Maintenance Technician Feagley, Nurse Lidwell, and Nurse Holden. (*Id.*).

Presently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Doc. 32). For the reasons set forth below, the Court will deny Defendants' motion.

### II. Summary Judgment Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## III. Statement of Undisputed Facts

On December 17, 2016, while housed at SCI-Smithfield, Bennett was moved to cell KA1025. (Doc. 34, Statement of Material Facts, ¶ 10; Doc. 40, Counterstatement of Material Facts, ¶ 10).

Maintenance work may not be performed in any area of an institution without a valid work order. (*Id.* at ¶ 11). On December 17, 2016, Work Order 2016-SMI-4633 was submitted for cell KA1025. (*Id.* at ¶ 12). Work Order 2016-SMI-4633 describes the problem as "[t]he cold water in 25 cell on the A2 Pod is not working and the water for the hot is constantly running." (*Id.* at ¶ 13). Defendants state that Bradley Corrie was assigned to

3

perform the plumbing maintenance for Work Order 2016-SMI-4633, and that the work was completed on December 19, 2016. (*Id.* at ¶¶ 14-15). Bennett coutners that Defendant Feagley responded to this work order, not Bradley Corrie, and that the cold water was not fixed on December 19, 2016. (Doc. 40, ¶¶ 14-15). He further avers that he complained about no working water in his cell for weeks after December 19, 2016. (*Id.* at ¶ 15).

On December 29, 2016, Work Order 2016-SMI-4805 was submitted for cell KA1025. (Doc. 34, ¶ 16; Doc. 40, ¶ 16). The work order describes the problem as "[s]ink continuously runs." (*Id.* at ¶ 17). Defendant Feagley was assigned to perform the plumbing maintenance for Work Order 2016-SMI-4805. (*Id.* at ¶ 18). The work was completed on January 6, 2017. (*Id.* at ¶ 19). Defendants maintain that the water in cell KA1025 was running continuously. (Doc. 34, ¶ 20). Bennett counters that the cold water in cell KA1025 was not running continuously, and the hot water dripped from the faucet one drop at a time. (Doc. 40, ¶ 20). The parties agree that Bennett's toilet was operational and running, he had regular access to other liquids, such as milk, and regular access to three meals per day. (Doc. 34, ¶¶ 21-23; Doc. 40, ¶¶ 21-23).

Defendants state that the only Defendant on duty on K block on December 19, 2016 was Lieutenant Keel. (Doc. 40, ¶ 25). Bennett asserts that Defendants Lidwell and Holden were also on duty on December 19, 2016. (Doc. 40, ¶ 25).

On December 19, 2016 at 11:36 a.m., Officer Kennawell was collecting lunch trays

on K block and passed by cell KA1025 to collect the tray. (Doc. 34, ¶ 26; Doc. 40, ¶ 26). Officer Kennawell continued his round without collecting Bennett's lunch tray. (*Id.* at ¶ 27). At 11:40 a.m., Officer Kennawell returned to Bennett's cell to attempt to collect his lunch tray again. (*Id.* at ¶ 28). Officer Kennawell remained outside of Bennett's cell for several seconds and then moved to the next cell. (*Id.* at ¶ 29). The parties dispute whether Officer Kennawell reported to Defendant Keel that Bennett was in distress, and whether Officer Kennawell radioed an emergency. (*Id.* at ¶¶ 30-31). Bennett avers that Officer Kennawell used his radio to report that he passed out. (Doc. 40, ¶ 30).

At 11:50 a.m., Unit Manager Joel Kohler looked into Bennett's cell for several seconds and then moved on. (Doc. 34, ¶ 32; Doc. 40, ¶ 32). The parties dispute whether Unit Manager Kohler reported to Defendant Keel that Bennett was in distress, and whether Kohler radioed an emergency. (*Id.* at ¶¶ 33-34).

At 12:05 p.m., Sergeant Rouch arrived at Bennett's cell and remained outside of the cell until 12:06 p.m. (*Id.* at ¶ 35). At 12:08 p.m., Officer Kennawell, Unit Manager Kohler, Sergeant Rouch, Defendant Lidwell, and Defendant Holden arrived on K block. (*Id.* at ¶ 36). Officer Kennawell, Unit Manager Kohler, and Sergeant Rouch went to Bennett's cell with a belt and cuffs, and called for Bennett to come to the cell door. (*Id.*). Defendants Lidwell and Holden went to the medical room on K block. (*Id.*).

At 12:09 p.m., Defendant Keel approached Bennett's cell and found him

unresponsive to officers' commands to stand up. (*Id.* at ¶ 37). Defendants Lidwell and Holden then entered Bennett's cell and assessed his condition. (*Id.* at ¶¶ 38-39). Bennett reported that he had been experiencing a headache since the night before. (*Id.* at ¶ 40). Bennett was given Motrin. (*Id.* at ¶ 41). Bennett was not diagnosed with dehydration and was not diagnosed with a bleeding hematoma on the back of his head. (*Id.* at ¶¶ 42-43). Bennett asserts that he complained of weakness, headaches, dizziness, and dry mouth as a result of being in a cell with no drinking water, and that he suffered a bleeding hematoma to the back of his head after his collapse. (Doc. 34, ¶¶ 42-43). The parties dispute whether Bennett knows the symptoms of dehydration. (Doc. 34, ¶ 44; Doc. 40, ¶ 44). Bennett did not complain of any other medical conditions related to dehydration after December 19, 2016. (*Id.* at ¶ 45).

On December 31, 2016, Bennett was moved to cell KA2055. (*Id.* at ¶ 24).

## IV. Discussion

### A. Conditions of Confinement Claim

The Eighth Amendment protects prison inmates from cruel and unusual punishment. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). However, not all deficiencies and inadequacies in prison conditions amount to a violation of a prisoner's constitutional rights. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). To assert an Eighth Amendment conditions of confinement claim, a prisoner must satisfy both an objective and subjective

6

test. See *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Specifically, a prisoner must show that the alleged deprivation is "sufficiently serious" and that he has been deprived of the "minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. A prisoner must also demonstrate that "he is incarcerated under conditions posing a substantial risk of serious harm" and that prison officials possessed a "sufficiently culpable state of mind" and demonstrated "deliberate indifference" to his health or safety. *Id.*

"Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson*, 501 U.S. at 304-05 (explaining the Court's statement in *Rhodes*, 452 U.S. at 347, that conditions of confinement, "alone or in combination," may deprive prisoners of the minimal civilized measure of life's necessities). "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson*, 501 U.S. at 305.

The deprivation of drinking water for several days may rise to the level of a constitutional violation when there is no legitimate penological interest. *See Young v. Quinlan*, 960 F.2d 351, 364-65 (3d Cir. 1992) (summary judgment not appropriate where factual allegations indicated that the inmate was placed in a dry cell for 96 hours, not provided with drinking water, and was taunted by guards about cell conditions), *superseded*

*by statute on other grounds as stated in Nyhuis v. Reno*, 204 F.3d 65, 71 n. 7 (3d Cir. 2000). When a prisoner is placed in a cell with no water and is not provided any access to fluids, the United States Court of Appeals for the Third Circuit has found that the deprivation is "sufficiently serious" and may in some circumstances demonstrate "deliberate indifference" to sustain a claim. *Collier v. Martinez*, 474 F. App'x 870, 874 (3d Cir. 2012). However, the Court also noted that if the inmate "were to have had access to adequate hydration during the period in question, even in conjunction with meals he otherwise did not desire to eat, his claim would necessarily fail, as he would not be able to show that the complained-of deprivation was 'sufficiently serious.'" *Id.* at n. 5.

In the case at issue, Bennett claims that he was housed in a cell with no working sink water for thirteen days and, as a result, he was forced to drink from the toilet, he suffered from dehydration, and ultimately collapsed after three days with no water. (Doc. 1, ¶¶ 37, 42, 44). Bennett further claims that he repeatedly complained about being in a cell with no sink water, asked prison officials for water, and requested to be moved to a cell with working sink water. (Doc. 1, ¶¶ 13, 16, 18, 21, 22, 28, 32-36; Doc. 40, ¶¶ 15, 42, 44). Defendants contend that the hot water in the cell was continuously running[1], and that Bennett was provided with milk during breakfast, which he does not drink, and he was provided with fruits and vegetables, which contain nutrients and water. (Doc. 33, pp. 12-14;

---

[1] Bennett counters that the hot water "ran out [of the faucet] a drop at a time". (Doc. 40, ¶ 20).

Doc. 34, ¶¶ 20, 22-23). There is clearly a dispute as to whether the fluids provided were inadequate so as to result in dehydration. Accordingly, Defendants' motion will be denied with respect to Bennett's unconstitutional conditions of confinement claim.

### 1. *Defendant Feagley*

Bennett sets forth a deliberate indifference claim against Defendant Feagley for "failure to fix plaintiff's water inside his cell on 12-19-16, via work order, and blatant refusals to fix it after returning [sic] at later dates . . . " (Doc. 1, ¶ 45). The record reflects that Defendant Feagley was not the individual who worked on Bennett's cell between December 17, 2016 and December 19, 2016. (Doc. 35-4, p. 6; Doc. 37, p. 49, Work Order 2016-SMI-4633). Work Order 2016-SMI-4633 reveals that Bradley Corrie performed the plumbing work for cell KA1025. (*Id.*). However, Work Order 2016-SMI-4805 clearly shows that Defendant Tim Feagley performed the plumbing work for cell KA1025 between December 29, 2016 and January 6, 2017.[2] (Doc. 35-4, p. 8; Doc. 37, p. 94, Work Order 2016-SMI-4805). Defendants nevertheless argue that Feagley cannot be deliberately indifferent because he had no personal involvement in the repair of the cell until the end of Bennett's stay in cell KA1025. (Doc. 33, p. 15). Because the evidence reflects that Defendant Feagley was personally involved in performing maintenance work on cell KA1025, Defendant Feagley's request for summary judgment based on lack of personal involvement

---

[2] Bennett was housed in cell KA1025 until December 30, 2016.

will be denied.

### B. Deliberate Indifference to Medical Needs

The Eighth Amendment's proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103-05 (1976). In order to establish an Eighth Amendment medical claim, a plaintiff "must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (citing *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (citation omitted).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511

10

U.S. at 837. A mere difference of opinion between the prison's medical staff and the inmate regarding the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment. *See Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); *see also McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Smart v. Villar*, 547 F.2d 112, 113 (10th Cir. 1976), *cert. denied*, 450 U.S. 1041 (1981).

Bennett asserts that Defendants Lidwell, Holden, Sheetz, Wiser, Keel, and Rhone were deliberately indifferent to his serious medical needs. Bennett claims that Defendants Holden and Lidwell delayed medical response to him on December 19, 2016, and that Defendants Keel, Sheetz, Rhone, and Wiser refused to provide him with medical treatment.

### 1. *Defendants Lidwell and Holden*

Bennett claims that he collapsed in his cell on December 19, 2016, between 11:20 a.m. and 11:30 a.m., during tray collection at lunch. He has submitted evidence supporting his claim that a medical emergency occurred inside his cell on December 19, 2016. (Doc. 37, p. 47, Initial Review Response). Defendants Lidwell and Holden reported to Bennett's cell at 12:09:36 p.m. (Doc. 34, ¶ 39). They acknowledge that their response time was approximately thirty-three minutes. (Doc. 33, p. 18). Defendants Lidwell and Holden further acknowledge that it takes approximately two to five minutes to walk from the medical department to K Block. (Doc. 35-2, p. 5, Interrogatory Responses of Melissa Holden; Doc. 35-3, p. 5, Interrogatory Responses of Alexa Lidwell). However, Defendant Lidwell also

11

states that they were already on K Block when they were summoned to Bennett's cell. (Doc. 37, p. 88). Defendant Lidwell and Holden assert that they were never alerted to a medical emergency, and their delay of thirty-three minutes did not violate Bennett's constitutional rights. (Doc. 34, ¶¶ 31, 33; Doc. 33, pp. 16-19). It is clear that the parties dispute whether Bennett suffered a medical emergency, whether dehydration caused him to collapse, and whether the response time of thirty-three minutes constituted deliberate indifference. As such, the Court will deny the motion for summary judgment in this regard.

### 2. *Defendants Sheetz, Wiser, Keel, and Rhone*

Bennett next contends that Defendants Keel, Sheetz, Rhone, and Wiser refused to provide him with medical treatment despite knowing that there was no drinking water in his cell, which causing him to suffer from headaches, blurry vision, and dizziness prior to his collapse on December 19, 2016. In their interrogatory responses, Defendants Keel, Sheetz, Rhone, and Wiser state that they do not recall whether Bennett had no working water in his cell, he did not complain that he had no working water in his cell until December 19, 2016[3], and they do not recall whether Bennett collapsed. (Doc. 37, pp. 53, 60, 66; Doc. 37-1, p. 5).

Defendants Keel, Sheetz, Rhone, and Wiser acknowledge that the sink is the only source of water for inmates housed in the RHU. (Doc. 37, pp. 54, 60, 67; Doc. 37-1, p. 6). Defendants assert that they reasonably believed that Bennett had water in his cell because

---

[3] Work Order 2016-SMI-4633 was entered on December 17, 2016. (Doc. 37, p. 49).

12

the work orders indicated that there was continually running water in the sink and the toilet. (Doc. 33, p. 20). Defendants further contend that Bennett was only in the cell for approximately three days before the first work order was completed, he was only diagnosed with a headache and was not diagnosed with dehydration, and has thus failed to establish that he suffered a serious medical need. (*Id.*). The December 19, 2016 Nursing Evaluation Tool confirms that Bennett was diagnosed with a headache, he was provided Motrin, and he was referred for further treatment due to dizziness. (Doc. 35-1, p. 10). The parties genuinely dispute the extent of Bennett's injuries, whether he suffered a bout of dehydration causing him to collapse, and whether he was denied access to treatment for those injuries. Because there are genuine issues of material fact, the Court will deny the motion for summary judgment with respect to the deliberate indifference claim against Defendants Keel, Sheetz, Rhone, and Wiser.

### C. Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction,

and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. It

"provides ample protection to all but the plainly incompetent or those who knowingly violate

the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as an official

reasonably believes that his conduct complies with the law, qualified immunity will shield

that official from liability." *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012) (citing

*Pearson*, 555 U.S. at 244). Although qualified immunity is generally a question of law that

should be considered at the earliest possible stage of proceedings, a genuine dispute of

material fact may preclude summary judgment on qualified immunity. *Giles v. Kearney*, 571

F.3d 318, 325-26 (3d Cir. 2009).

A qualified immunity determination involves a two-pronged inquiry: (1) whether a

constitutional or federal right has been violated; and (2) whether that right was "clearly

established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555

U.S. at 236 (permitting federal courts to exercise discretion in deciding which of the two

*Saucier* prongs should be addressed first). Because there are genuine issues of fact as to

whether a constitutional right has been violated, the Court will deny Defendants' motion on

the grounds of a qualified immunity defense. The denial, however, will be without prejudice.

## V. Conclusion

Based on the foregoing, the Court will deny Defendants' motion (Doc. 32) for

summary judgment.

A separate Order shall issue.

Dated: September 20, 2019

Robert D. Mariani
United States District Judge